UNITED STATES *v*. D. H. GRANT & CO., INC. (No. 5002)[1]

---

[1] C.A.D. 723.

United States Court of Customs and Patent Appeals,
November 16, 1959

*George Cochran Doub*, Assistant Attorney General, and *Richard E. FitzGibbon*, Chief, Customs Section (*Murray Sklaroff*, trial attorney, of counsel), for the United States.
*Lamb & Lerch, J. G. Lerch, amicus curiae.*
*Siegel, Mandell & Davidson, Joshua M. Davidson* (*David Serko* of counsel), for appellee.

[Oral argument October 6, 1959, by Mr. Sklaroff, Mr. Lerch, and Mr. Davidson]

Before WORLEY, Chief Judge, and RICH, MARTIN, and SMITH, Associate Judges, and Judge WILLIAM H. KIRKPATRICK [2]

MARTIN, Judge, delivered the opinion of the court:

This appeal is from a judgment of the Customs Court, Second Division, C.D. 2065, sustaining importer's protest and holding the merchandise in dispute to be classifiable under paragraph 907 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade (GATT), T.D. 51802, as "waterproof cloth, wholly or in chief value of cotton * * *." The collector classified the imported fabric under paragraph 904 (c) and (d) of the Tariff Act of 1930, as modified by GATT, as "Cotton cloth, printed, dyed or colored * * *," and assessed it accordingly.

Pertinent for consideration with respect to the competing contentions of the parties are the following provisions:

Paragraph 904 of the Tariff Act of 1930, as modified by T.D. 51802:

_____

[2] United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate *in place of Judge O'Connell*, pursuant to the provisions of Title 28, United States Code, Section 294(d).

(c) Cotton cloth, printed, dyed, or colored, containing
varns the average number of which—

 Does not exceed number 60, if valued at more than
90 cents per pound; or exceeds number 60 but does
not exceed number 80, if valued at more than $1.40
per pound_____ 12% ad val. and, in ad-
 dition thereto, for each
 number, $\frac{1}{4}$ of 1% ad
 val.

\* \* \* \* \* \* \*

(d) The additional duty to be levied, collected, and paid under
paragraph 904(d), Tariff Act of 1930, on cotton cloth woven with
eight or more harnesses, or with Jacquard, lappet, or swivel attach-
ments, or with two or more colors or kinds of filling shall be_____ 2½% ad val.

Paragraph 907 of the Tariff Act of 1930, as modified by T.D.
51802:

Cotton window hollands, and all oilcloths (except silk oilcloths
and oilcloths for floors) ; filled or coated cotton cloths not specially
provided for ; and *waterproof cloth, wholly or in chief value of cot-
ton or other vegetable fiber, whether or not in part of India rubber*
[Italics supplied.]_____ 12½% ad val.

Of particular interest in this case is the Treasury publication of
October 11, 1954, T.D. 53630, since it apparently precipitated this
litigation. It reads:

(1) *Waterproof cloth*—Cloths of a kind which are not generally used in the
manufacture of articles which are designed to afford protection against water
to the extent expected in raincoats, protective sheeting, dress shields, umbrella
fabrics, and similar articles, even when such cloths possess water repelling
characteristics, are not classifiable as waterproof cloth within the meaning of
paragraph 907, Tariff Act of 1930. Insofar as this decision results in the
assessment of duty at a rate of duty higher than that which has heretofore
been assessed under a uniform practice, it shall be applied only to merchandise
entered, or withdrawn from warehouse, for consumption after 90 days from
the date of publication of this abstract. Bureau letter to the collector of
customs, New York, New York, October 11, 1954.

The importation was invoiced as "all cotton, vat dye clan plaid
gingham-waterproofed-shrunk finish." The cloth had been treated
with chemicals which rendered it repellent or resistant to water.
The treating process consisted of singeing loose fibers from the fabric,
and washing, drying and desizing the cloth. Thereafter a solution
of Mystolene[3] and Mystolene R.E.T.[4] was applied. The excess
solution was removed and the cloth was dried, calendered and
shrunk.

---

[3] According to the evidence, Mystolene is a composition containing "paraffin wax, a
protein and aluminum formic acid rosin. [sic]"
[4] Testimony indicates that Mystolene R.E.T. contains "synthetic rosin [sic], formic acid,
a protein, white spirit, and water.

The parties are agreed that the fabric at bar passed the 24-hour cup test,[5] and that this test has been the standard adopted by the Government for at least the past 28 years for determining whether cloth is classifiable as being water proof. Counsel further stipulated that prior to the promulgation of T.D. 53630, supra, merchandise of the quality of the import here in issue has been classified uniformly as waterproof cloth. It was also agreed that the goods are wholly or in chief value of cotton.

Counsel ask us to determine whether the imported goods are "waterproof cloth." If they are not, it is conceded that the provisions of paragraph 904 will control.

The Government's contention, as stated in its brief, is that "the use of the cloth is indicative of whether or not it is waterproof." Of necessity, therefore, the Government urges that its own 24-hour cup test is not decisive of classification and that T.D. 53630 was necessary to overrule an allegedly erroneous practice and reinstate the use test it says the prior court decisions engrafted on paragraph 907.

On the other hand, appellee asserts that the term "waterproof" in paragraph 907 denotes a condition or state of being. That quality is to be determined by the 24-hour cup test, this being the sole test utilized by the Government for the past 28 years. If the cloth is qualitatively waterproof, *and* that is the intended result, then it is "waterproof cloth" within the meaning of paragraph 907.

The waterproof cloth provision, without any significant change, has been a customs classification under various statutes since 1897. Although the Board of General Appraisers at first gave the impression that this designation included only cloth that was made absolutely impervious to water, appellate court decisions have reflected a less rigid connotation.

Apparently the first appellate court decision which endeavored to construe the meaning of the term "waterproof cloth" is *United States* v. *Brown & Eadie*, 136 Fed. 550, T.D. 26124, Circuit Court of Appeals, Second Circuit, which involved the Tariff Act of 1890. The waterproof cloth designation under that Act was not limited to any particular fiber. In that case the importation consisted of woolen cloth which was processed with wax to make it water repellant. The material, used to make rainwear garments, was called "cravenette cloth"

---

[5] A 15 inch square of cloth is placed over a liter beaker, a pocket or cup is formed in the cloth, avoiding folds if possible, and the periphery of the cloth is fastened by such as rubberbands to the outside of the beaker. Then 0.4 liter of water at room temperature is poured gently into the "cup." If after 24 hours no water appears in the beaker, the fabric is considered to be waterproof. This is the test procedure followed by the Bureau of Customs Laboratories as shown by Exhibit A.

and was commercially known to be waterproof. The court, in holding the merchandise to be "waterproof cloth," said:

\* \* \* Cravenette is not absolutely waterproof; in this respect it resembles gossamer rubber cloth and other materials universally recognized as waterproof. *Few so-called waterproof cloths are absolutely impervious to water.* Practically and relatively cravenette is waterproof. It would offer slight protection to a sailor constantly dashed with spray on the deck of a storm-tossed vessel, but it would be a fair substitute for an umbrella and would keep the wearer dry in an ordinary shower of rain. Many so-called fireproof buildings disappeared in the conflagration which recently swept over Baltimore and it is probably true that cravenette cloth would furnish inadequate protection in an unusually severe downpour of rain. Nevertheless for all ordinary uses it is waterproof and that term is properly used in describing it. [Italics added.]

In the case of *United States* v. *Hudson Forwarding & Shipping Co.*, 18 CCPA 258, T.D. 44427, this court construed the meaning of waterproof cloth under paragraph 907 of the Tariff Act of 1922. That case involved the importation of cotton fabric coated on both sides with cotton fibers adhered with a mucilaginous substance in such a way as to simulate lizard skin, the goods being intended for use as trimming for ladies' dresses. It had not been intentionally processed to impart waterproofing properties. However, the evidence revealed that water would remain on the upper surface of the cloth for several hours without penetrating through it. The court said:

The first question to be determined is whether all cloth which is impervious to water is, in a tariff sense, waterproof cloth unless more specifically provided for. We do not think that Congress intended that cloth which was not in its manufacture designed to repel or turn water in use, *or* cloth that is not suitable for such use, should be included in the term "waterproof cloth" found in said paragraph 907. If, in the manufacture of the cloth, its being rendered impervious to water is merely an incidental result, without any intent or design to make it waterproof for the purpose of repelling or turning water, and it is not suitable for such use, it is, in our opinion not "waterproof cloth" within the meaning of said paragraph.

\* \* \* \* \* \* \*

We think all of the above indicates that "waterproof cloth," as those words were used by Congress, means cloth designedly rendered impervious to water *or* suitable for use as material for articles designed to repel water. [Italics added.]

At this point it should be noted that the court placed emphasis on the alternative that such cloth, in order to be considered waterproof, had to be "designedly rendered impervious to water *or* suitable for use as material for articles designed to repel water." [Italics added.]

In *United States* v. *E. Dillingham, Inc.*, 19 CCPA 210, T.D. 45297, this court again had an opportunity to construe the meaning of waterproof cloth under paragraph 907 of the Tariff Act of 1922. The merchandise involved there was assessed for duty by the collector as "water-

proof cloth." The importer's protest was sustained by the court below. This court in reversing the Customs Court stated:

It is clear, we think, from the quoted statement contained in the Summary of Tariff Information and from the language of the statute itself, that the Congress did not intend that the provisions for "waterproof cloth" should include only such cloth as was impervious to water, but that, on the contrary, Congress intended that cotton cloth *substantially* impervious to water and intended to repel or turn water *or* suitable for use as material for articles designed to repel or turn water should be included within the paragraph, unless otherwise more specifically provided for. [Last italics ours.]

Again, in *United States* v. *Western Commercial Co.*, 20 CCPA 239, T.D. 46040, this court construed waterproof cloth under paragraph 907 of the Tariff Act of 1922. The merchandise in that case consisted of cotton cloth, closely woven, in the gray, which had not been filled, coated nor treated with any so-called waterproofing material. This court in reversing the lower court and holding the merchandise to be waterproof cloth stated:

It has been established by the Government that the imported cloth is substantially impervious to water. It is true that it has not been treated with any waterproofing material, and that its waterproof character is entirely due to the fact that it is a closely woven fabric. However, it is clear from the legislative history, referred to in the *Hudson Forwarding & Shipping Co.* and *E. Dillingham* (*Inc.*) cases, *supra*, that the Congress did not intend to limit the provisions for waterproof cloth in paragraph 907 to such cloth as had been specially treated with waterproofing material.

In the Summary of Tariff Information, 1921, the Tariff Commission reported to the Finance Committee of the Senate that—

* * * Any cloth that is impervious to water, or that is substantially so and intended to turn water, may be classed as a waterproof cloth. Some fabrics invoiced as waterproof cloths and held to be so dutiable are simply close-woven cotton cloths which have undergone no special treatment; others are made by cementing together two cloths (such as the duplex fabric made of a printed cloth and a dyed cloth and used for raincoats) that are otherwise not waterproof. The waterproof cloths used in domestic trade have for the most part, however, been subjected to various finishing processes, the nature and extent of which are dependent on the service that is expected of the particular goods.

We believe the language used by this court in *United States* v. *Dillingham*, supra, establishes the best guide to determine what fabric is "waterproof cloth" for tariff purposes, wherein the court said:

* * * Congress intended that cotton cloth *substantially* impervious to water *and intended to repel or turn water or suitable for use* as material for articles designed to repel or turn water should be included within the paragraph, unless otherwise more specifically provided for. [Last italics ours.]

Our discussion should now turn to the tests which have been accepted by the Government and the courts to determine when cloth is considered substantially impervious to water for tariff purposes.

In *United States* v. *Brown & Eadie, supra*, a test not unlike the "cup" test was used to determine whether the imported fabric was waterproof. The court stated concerning this:

* * * Cravenette cloth is treated with wax, and that water will not readily pass through is proved by a conclusive test. One of the witnesses made a bag of the cloth and filled it with water and at the end of 48 hours not only was the water held but the underside of the bag was not even wet.

In *United States* v. *Hudson Forwarding & Shipping Co.*, supra, the court did find that the cloth in question was "practically impervious" to water as shown by a test, the basic elements of which are the same as the "cup" test. And in *United States* v. *Dillingham, Inc.*, supra, the evidence revealed that the acting appraiser subjected the merchandise "to a test in order to determine whether it was waterproof; that the test consisted of tying a piece of the cloth over the top of an ordinary drinking glass, arranging it so as to form a 'pocket,' pouring about one-half of 1 inch of water into the 'pocket,' and permitting it to stand for about 65 hours. He said that, at the expiration of that time, although the under surface of the cloth was damp, the water had not leaked through into the glass." The court was satisfied that this test was sufficient to uphold the appraiser's finding that the cloth was waterproof within the then pertinent tariff provisions.

Finally in *United States* v. *Western Commercial Co.*, supra, a Government witness testified that he made two tests on the imported goods, the "cup" test and the "drip" test, the latter being the more severe. The cloth was found to be substantially impervious to water.

From the cases it appears, therefore, that if cloth passes the "cup" test or equivalent tests it has the property of being "substantially impervious" to water for tariff purposes.

With these principles in mind, we now turn to the case at bar. Without going into the evidence in detail, it will suffice to say that the manufacturer went to great lengths to secure waterproofing material to apply to the cloth. A witness representing the English company whose primary business was that of supplying waterproofing material and which company was the supplier in this instance, replied, when asked if his company made anything which would render cloth more impervious to water than Mystolene, "No, sir; if I thought so I would have recommended it." Unquestionably the importer was endeavoring to purchase cloth which was intended to repel or turn water. The next question which must be decided is, did it do so?

Insofar as the requirements of the Government are concerned, we must answer this question affirmatively, counsel having stipulated first,

that the merchandise passed the 24-hour cup test,[6] and second, that this test has been the standard adopted by the Government for at least the past 28 years to determine whether imported cloth is waterproof for tariff purposes. Furthermore, a witness for the Government, the chief of the textile and dye division of the United States Customs Laboratory, testified that the "cup" test was the only one being used at the time this litigation was before the Customs Court.

Since the Government has used the "cup" test for over 28 years and the courts have accepted the results of very similar tests as determinative of whether cloth is waterproof, and since the Congress has neither promulgated nor suggested any other procedure, the testimony introduced by the Government relating to other tests cannot aid this court in resolving the issues herein involved.

With reference to the Customs Bureau letter, T.D. 53630, which attempts to limit the coverage of paragraph 907 to such cloth as is "generally used" for a waterproofing purpose, this court cannot be controlled by a governmental ruling which endeavors to construe a statute contrary to the decisions of the courts which have adjudicated the Congressional intent of that particular statute. In view of this court's determination of the meaning of waterproof cloth in previous cases, we believe the Government's contention that the use of the cloth is determinative of whether that cloth is waterproof, is untenable.[7]

The cases cited in this opinion construe the meaning of waterproof cloth in previous tariff statutes; therefore, it can be assumed that since the Congress reenacted paragraph 907 in 1930 without significant change, the prior judicial interpretation properly reflected the Congressional intent. *United States* v. *Bassichis Co.* et al., 16 Ct. Cust. Appls. 410, T.D. 43133; *James P. Smith & Co.* v. *United States*, 21 CCPA 514, T.D. 46971.

In view of the foregoing, we find that the merchandise at bar comes within the purview of paragraph 907 of the Tariff Act of 1930. Accordingly we *affirm* the judgment of the Customs Court.

---

[6] The testimony revealed that the merchandise not only passed the 24-hour cup test, but that even after 96 hours there was no evidence of water penetration.

[7] In fact, according to this court in the case of *United States* v. *Western Commercial Co.*, supra, Government counsel contended that "use" was *not* significant to the issues involved. The court said concerning this matter:

> It is contended by counsel for the Government that the court below erred in considering the use of the involved merchandise; that, as the cloth is substantially impervious to water, it is "waterproof cloth" within the meaning of the provisions contained in paragraph 907, regardless of the uses for which it was designed or intended.

Furthermore. in *United States* v. *Dillingham,* supra, no evidence was offered by the importer as to the intended use of the imported goods, and yet the goods were found to be waterproof within the purview of paragraph 907.